Pittsburgh Corning Corp. v. McCormick Insulation Supply, Inc., 2010 NCBC 17.

| | |
|---|---|
| NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE<br>SUPERIOR COURT DIVISION |
| GUILFORD COUNTY | 10 CVS 5466 |

PITTSBURGH CORNING CORPORATION,

     Plaintiff,

     v.

McCORMICK INSULATION SUPPLY, INC.
and BATT FABRICATORS, INC.,

     Defendants.

**ORDER ON PLAINTIFF'S MOTION FOR
A PRELIMINARY INJUNCTION**

{1}    THIS MATTER is before the Court on Plaintiff"s Motion for a Preliminary Injunction against Defendants McCormick Insulation Supply, Inc. and Batt Fabricators, Inc.

> *Reed Smith, LLP by Jeffrey J. Bresch and Jayme L. Butcher; Smith Moore Leatherwood by Richard Coughlin for Plaintiff Pittsburgh Corning Corporation.*

> *Wyatt Early Harris Wheeler LLP by Scott F. Wyatt, Kim R. Bauman, and Kerri L. Sigler for Defendants McCormick Insulation Supply, Inc. and Batt Fabricators, Inc.*

Tennille, Judge.

I.

PROCEDURAL BACKGROUND

{2}    This action was filed in Guilford County on April 9, 2010. The matter was designated a mandatory complex business case by order of the Chief Justice of the Supreme Court of North Carolina dated April 14, 2010 and subsequently assigned to the undersigned Special Superior Court Judge for Complex Business Cases by

order of the Chief Special Superior Court Judge for Complex Business Cases dated April 14, 2010.

{3}    Plaintiff Pittsburgh Corning Corporation filed a Motion for a Preliminary Injunction pursuant to Rule 65 of the North Carolina Rules of Civil Procedure.  The Court heard oral arguments and live testimony on the Motion on September 29, 2010.

II.

FACTUAL BACKGROUND

A.

THE PARTIES

{4}    Plaintiff Pittsburgh Corning Corporation ("PCC") is a Pennsylvania corporation with its principal place of business at 800 Presque Isle Drive, Pittsburgh, PA 15239.  (Compl. ¶ 26.)

{5}    Defendant McCormick Insulation Supply, Inc. ("McCormick") is a Maryland corporation with its principal place of business in Maryland.  (Answer, Countercl. & Third Party Compl. of Def. McCormick Insulation Supply, Inc. ¶ 1.)

{6}    Defendant Batt Fabricators, Inc. ("Batt") is a North Carolina corporation with its principal place of business at 12957 Trinity Road, Trinity, North Carolina 27370. (Compl. ¶ 28; Answer of Def. Batt Fabricators, Inc. ¶ 28.)  Batt is owned by Brett and Amy McCormick and by Todd and Tara Hoover.  (*See* Rule 30(b)(6) Dep. of Tara Hoover ("Tara Hoover Dep.") 94, May 11, 2010.)  Batt fabricates cellular glass insulation material for use as insulation.  (Answer of Def. Batt Fabricators, Inc. ¶ 43.)

B.

FINDINGS OF FACT

{7}    The Court makes the following findings of fact:

{8}    PCC is the only manufacturer in the United States of cellular glass insulation, trademarked and known as Foamglas®.  (Compl. ¶ 33.)

{9}    From 1963–May 2008, McCormick was a licensed distributor for PCC Foamglas® cellular glass insulation. (Brett McCormick Aff. ¶ 5; Compl. ¶ 38; Tara Hoover Dep. 49.)

{10}    In May 2008, PCC terminated its relationship with McCormick and no longer provided McCormick with any inventory of Foamglas® cellular glass insulation. (Brett McCormick Aff. ¶ 7; Tara Hoover Dep. 58.) Until that time, PCC was McCormick's only supplier of cellular glass insulation. (Tara Hoover Dep. 163.) Thus, its customers were accustomed to receiving PCC Foamglas® cellular glass insulation when they ordered cellular glass insulation.

{11}    After May 2008, McCormick began to import cellular glass insulation into the United States from Chinese sources. (Tara Hoover Dep. 49.) From 2008 through September 23, 2010, McCormick received cellular glass insulation from Qingdao International Tradelink Co.; Mowco Insulation & Sealing Products; and Jiaxing Lianxin Foamglass Co., all located in China. (Brett McCormick Aff. ¶ 10.) At the same time, McCormick was also able to purchase Foamglas® cellular glass insulation from other PCC distributors.

{12}    McCormick received eleven (11) shipping containers filled with cellular glass material from Chinese sources. (*See* Rule 30(b)(6) Dep. of Robert McCormick ("Robert McCormick Dep.") 34, May 11, 2010.) The total weight of the material from the Chinese sources was over 100,000 kg. (220,000 pounds). (Tara Hoover Dep. 58.)

{13}    Material from approximately three (3) of the shipping containers was distributed to Lee Air Conditioners (d/b/a Allied Mechanical Services) for the University of North Carolina Bell Tower Parking Garage project ("Bell Tower project").

{14}    As of September 23, 2010, material from approximately one (1) container was being housed at Batt "in converted core form." (Brett McCormick Aff. ¶ 10.) Pieces of the cellular glass insulation can be used for "future jobs requiring smaller pipe size applications of this insulating material." (Brett McCormick Aff. ¶ 10.)

{15}   Material from the remaining seven (7) containers may have been distributed to any or all of fifty-three named McCormick customers who received fabricated cellular insulation from Batt between May 2008 and the present.  (Brett McCormick Aff. ¶ 10.)

{16}   Batt receives raw cellular glass material from McCormick via "tractor trailer, enclosed trailer, flat bed and/or container" in block form and in various thicknesses.  (Todd Hoover Aff. ¶ 5.)  Blocks are then sawed into pieces to make pipe coverings, and the pieces along with scrap may be glued together with an adhesive concrete.  (Todd Hoover Aff. ¶ 5.)

{17}   Visually, the Chinese source material and the PCC Foamglas® cellular glass insulation appear to be the same product.  (Rule 30(b)(6) Dep. of Brett McCormick ("Brett McCormick Dep.") 104–05, May 11, 2010.)

{18}   At Batt, the Chinese source material was comingled with PCC Foamglas® cellular glass insulation and was then shipped to customers.  (Bret McCormick Dep. 104–06.)

{19}   McCormick cannot state whether Chinese material was shipped to any particular customer.  It has no method to track the respective quantities of PCC Foamglas® cellular glass insulation and Chinese source material that were shipped to each of its customers.  (Robert McCormick Dep. 34.)  Additionally, McCormick's invoices do not indicate whether PCC Foamglas® cellular glass insulation or Chinese source material was supplied to specific customers.  (Brett McCormick Dep. 93.)

{20}   McCormick's invoices to customers after 2008 do not contain the registered mark for PCC Foamglas® cellular glass insulation.  The product is described in those invoices as: FOAMGLAS; FOAMGLASS; FG; CELLULAR GLASS; FMGL; FMG; and CELLGLASS.  (*See* Brett McCormick Aff., Ex. B.)

{21}   After 2008, McCormick left information on its website that it was a distributor of cellular glass insulation from PCC.  (*See* Compl., Ex. D: Screenshot of McCormick's website in 2010.)

{22} When Lee Air Conditioners asked McCormick for assurances that the material they provided for the Bell Tower project was PCC Foamglas® cellular glass insulation, Ms. Hoover sent an email to Brett McCormick asking for guidance. She wrote, "Someone has gone to engineer on UNC Bell Tower job and told them they are not using PC foamglass [sic] and that is [sic] something from China. Need to know how you want me to handle this. I mean I know I need to lie, but what do you want me to say. [sic] Just let me know, because I will need to call him back 1st thing Monday morning. He said he just need [sic] me to confirm it was PC." (Pl.'s Supplement to Mot. for Prelim. Inj., Ex D: Email from Tara Hoover (Feb. 20, 2010, 08:25:40 EST.)

{23} Brett McCormick responded to Ms. Hoover's email stating: "Has Batt been using PC packaging material in the boxes we discussed? Send an email out to your friends in China to get the most current product specifications on the shit we have been getting. . . . When you quoted, did you quote 'foamglas' or did you call it 'cellular glass' [sic] It was only a matter of time and this was a pretty high profile job. Call me before you talk to them." (Pl.'s Supplement to Mot. for Prelim. Inj., Ex E: Email from Brett McCormick (Feb. 20, 2010, 11:25:57 EST.)

{24} On February 22, 2010, Gregg Bucy, an employee of PCC, received permission from third parties on the Bell Tower project to collect insulation samples at various locations throughout the project and to test the cellular glass insulation provided by McCormick. (*See* Pl.'s Supplement to Mot. for Prelim. Inj. 7, 9.) On that same day, Ms. Hoover, a Regional Manager at McCormick and part owner of Batt, sent a letter to Lee Air Conditioners stating that all materials supplied for the Bell Tower project were "manufactured in the US to industry standards." (Compl., Ex. K: Letter from Tara Hoover, Regional Manager, McCormick, Feb. 22, 2010.)

{25} On March 23, 2010, in response to a letter from Terry Moody, Insulation Manager at Allied Mechanical Services, questioning whether the insulation supplied for the Bell Tower project was PCC Foamglas® cellular glass insulation, Ms. Hoover responded for McCormick that the material provided for the project was comprised of both PCC Foamglas® cellular glass insulation and material from a

foreign source. (Compl., Ex. L: Letter from Tara Hoover, Regional Manager, McCormick, Mar. 23, 2010.)

{26} Prior to March 2010, McCormick had never notified any of its customers that it was providing cellular glass insulation from foreign sources. (Tara Hoover Dep. 149.) After the source of product used on the Bell Tower project became known, McCormick replaced the insulation on the project with PCC product at its own expense.

The Chinese Product Does Not Meet Industry Standards

{27} In two separate tests conducted on the cellular glass insulation imported from China that have been reported by experts in this case, the material failed to comply with the thermal conductivity requirements for Cellular Glass Thermal Insulation as defined in ASTM International C552-07 ("ASTM C552"), which was adopted in December 2007 as an industry standard. (*See* Pl.'s Master Ex. in Support of Pl.'s Supplement to Mot. for Prelim. Inj. ("Pl.'s Master Ex."), Ex. 35: Expert Report of Keith P. Rickabaugh ("Rickabaugh Report") 4; Pl.'s Master Ex., Ex. 53: Standard Specification for Cellular Glass Thermal Insulation 1.)

{28} Plaintiff obtained samples of the Chinese source material from Batt on July 7, 2010 and tested those samples on July 27, 2010 at the RJ Lee Group's ("RJLG") laboratory. Among other things, the laboratory tested the material for its insulative properties. The measurement called the "k value" is used to describe materials' insulative properties. The lower the k value, the lower a material's thermal conductivity and the better the material's thermal insulative properties. (*See* Rickabaugh Report 4.)

{29} Of the four samples of the Chinese material tested for thermal conductivity, all four had values over the requirement specified in ASTM C552 (0.31 BTU in/ (hr ft$^2$ °F) at 75 °F (24 °C)). The four thermal conductivity values reported were: 0.44; 0.41; 0.40; and 0.37 BTU in/ (hr ft$^2$ °F) at 75 °F (24 °C). (*See* Rickabaugh Report 10.) The thermal conductivity value for the PCC Foamglas® cellular glass insulation tested was 0.28 BTU in/ (hr ft$^2$ °F) at 75 °F (24 °C), lower than the

industry standard. (*See* Rickabaugh Report 10.)  Thus, the PCC material tested is a better insulator than the standard requires.  The thermal conductance value for the PCC Foamglas® cellular glass insulation was nearly forty (40) percent lower than the Chinese source material.  (*See* Rickabaugh Report 4.)

{30}   Plaintiff's expert, Keith P. Rickabaugh, obtained additional samples of Chinese source material from Batt on September 14, 2010, and RJLG tested that material for its thermal conductivity.  It determined that the thermal conductivity value for that sample was 0.40 BTU in/ (hr ft$^2$ ºF) at 75 ºF (24 ºC), a level consistent with the Chinese material from Batt tested in July 2010.[1]  (Rickabaugh Report 16.)

The Chinese Product Poses a Health Hazard

{31}   In three separate tests conducted on the cellular glass insulation imported from China that have been reported by experts in this case, the material contained crystalline silica (i.e., quartz) at concentrations in excess of 0.1 weight percent. (Rickabaugh Report 9, 16; A. Nelson Aff., Ex. C.)

{32}   The four samples RJLG tested in July 2010 measured the following amount of crystalline silica as a percent of the total weight of the material: 2.6; 5.7; 4.5; 4.0%. (Rickabaugh Report 9.)  The grains of crystalline silica found are considered to be of respirable size.  (Rickabaugh Report 4.)  Respirable crystalline silica is recognized as a human carcinogen and is regulated by the Occupational Safety and Health Administration ("OSHA") under 29 CFR § 1910.

{33}   The samples of Chinese source material RJLG obtained in September 2010 from Batt contained concentrations of crystalline silica ranging from 2.0 to 2.7% (Rickabaugh Report 16.)

---

[1] Defendants' expert, A. Barry Nelson, PG, also obtained samples of the Chinese source material from the same source at Batt at the same time Plaintiff's expert received the sample he tested.  Mr. Nelson did not report the sample's thermal conductivity.  (*See* A. Barry Nelson Aff. Exs. B & C.) The scope of his test was limited to determining whether the Chinese source material contained crystalline silica in sufficient concentrations that would require McCormick to provide MSDS information and handling precautions to users of the material, in accordance with OSHA regulations.  (*See* A. Barry Nelson Aff., Ex. B.) The Court did not require that he test the sample for thermal conductivity.

{34}   Analysis of PCC Foamglas® cellular glass insulation reported by RJLG on June 7, 2010, August 5, 2010, and August 6, 2010 revealed no detectable levels of crystalline silica. (Rickabaugh Report 16.)

{35}   Chinese source material obtained from the same Batt source tested by Mr. Nelson (Defendants' expert) and reported on September 23, 2010 measured the following amount of crystalline silica as a percent of the total weight of the material: 1.3%.  (A. Barry Nelson Aff., Ex. C.)

{36}   McCormick did not know and never asked about the contents or the specifications for the Chinese product it sold until after the Bell Tower project dispute caused a concern.  McCormick finally asked its Chinese providers for information about the product in February 2010.  (Brett McCormick Dep. 132.)

{37}   On February 23, 2010, Ms. Hoover was advised by a Chinese business contact that there are Chinese suppliers who manufacture cellular glass insulation that is "very good quality," but that the price is "HIGH."  The calculations using the price for the quality Chinese cellular glass insulation had already been discussed with Tony Hoover, and the price was determined to be "very high."  (Pl.'s Supplement to Mot. for Prelim. Inj., Ex. K: Email from Hao Junzhi (Feb. 23, 2010 16:34:34 PST.)

{38}   McCormick charged its customers the same price for the cheap Chinese cellular glass material as it did for PCC Foamglas® cellular glass insulation.  (Tara Hoover Dep. 91–2.)  The price of the Chinese cellular glass purchased by McCormick was significantly lower than the cost of PCC Foamglas® cellular glass insulation.  By charging its customers the same price as they would have been charged for PCC product, McCormick not only reaped extra profit but also maintained the deception about the source of the product.

{39}   McCormick took it upon itself to determine that when its customers who had always received PCC product order "foamglass"; "foamglas"; "FG"; or "cellular glass insulation", the customers were using a generic term, and McCormick could send whatever it chose.  In doing so, it erred—intentionally.  McCormick's conduct was deceptive and gives rise to a presumption of confusion.

{40} Without advising any of its customers, McCormick imported an inferior foreign insulation product that was identical in appearance to PCC Foamglas® cellular glass insulation despite not knowing about the product's quality or its performance characteristics. It then passed those goods off as PCC Foamglas® cellular glass insulation or deceived its customers as to the source of the product delivered.

{41} Cellular glass insulation containing Chinese source material may be lining the pipes of hospitals, schools, museums, and office buildings. Based on Mr. Rickabaugh's testimony, this material may not be harmful if left undisturbed. However, when it is moved or repaired, it could be harmful to workers who would be unaware of the hazard and needlessly exposed to risk of inhaling a potentially harmful substance. (Hr'g Test. of Keith Rickabaugh.)

{42} McCormick received the information about the levels of crystalline silica in the Chinese source material that was distributed to as many as fifty-three of its customers from its own expert's report on September 23, 2010. (*See* A. Barry Nelson Aff.)

{43} McCormick waited until September 28, 2010, the eve of the Preliminary Injunction Hearing, to give any notice to those customers. (*See* Defs.' Hr'g Exs. Inj-1, Inj-2.; Hr'g Test. of Brett McCormick.)

{44} In that notice dated September 28, 2010, McCormick said to its customers in the body of a letter: "Thank you for your business. Enclosed is a Material Safety Data Sheet for your records for cellular glass insulation which has been supplied since 2008. We look forward to working with you in the future." A Material Safety Data Sheet ("MSDS") created to inform customers about the ingredients of the Chinese source material was enclosed. (Defs.' Hr'g Exs. Inj-1, Inj-2.)

{45} This communication did not give customers any notice that they may have received cellular glass insulation that was from a source other than PCC. It did not inform customers that the cellular glass insulation they may have received was an inferior insulator to PCC Foamglas® cellular glass insulation. It did not draw McCormick's customers' attention to the fact that the Chinese source material

McCormick shipped them contains reportable levels of crystalline silica, a known carcinogen. It did not state that the reason customers received the notice was due to the crystalline silica content of material that it may or may not have received. Nor did it notify the customers that the product received may have failed to meet industry standards. The MSDS created more potential for liability by leaving customers with ambiguous information from which they could conclude that they had received a product with a known carcinogen from PCC.

{46}   The foregoing facts establish a clear threat to the goodwill and reputation of PCC.

III.

CONCLUSIONS OF LAW

{47}   The Court makes the following Conclusions of Law based on its findings:

{48}   Defendants have impermissibly passed off inferior and dangerous products as Foamglas® cellular glass insulation. Such conduct is an unfair trade practice which may irreparably injure Plaintiff.

{49}   McCormick's September 28, 2010 letter sent to the fifty-three customers who may have received cellular glass insulation from the Chinese suppliers is insufficient to give notice that the material they received could contain hazardous carcinogenic materials. Workers in the future may be exposed unknowingly to a known carcinogen if proper notification is not made, thus potentially causing irreparable injury.

{50}   McCormick's September 28, 2010 letter sent to the fifty-three customers who may have received PCC Foamglas® cellular glass insulation for all or part of their order misleads them. The Material Safety Data Sheet sent by McCormick is meant to inform their customers about the contents of the Chinese material. Customers who received PCC Foamglas® cellular glass insulation are made to believe that the Material Safety Data Sheet warns them of PCC's product. The letter could cause customer confusion by making them believe that PCC Foamglas®

cellular glass insulation has been found to be hazardous or was the impetus for the notice. The foregoing is an unfair and deceptive trade practice.

{51} McCormick's fifty-three customers listed as having received insulation from Batt did not know they were receiving a product other than PCC Foamglas® cellular glass insulation. Even if a customer received cellular glass insulation from only the Chinese source material, McCormick's September 28, 2010 letter could be misleading. If the customer still assumes the insulation received was from PCC, the Material Safety Data Sheet still falsely serves as a warning to that customer about PCC Foamglas® cellular glass insulation. That is an unfair and deceptive trade practice.

{52} Plaintiff has carried its burdens of proof that it is likely to prevail on the merits and that it will be irreparably injured if an injunction is not issued.

IV.

CONCLUSION

{53} Based on the foregoing, it is hereby ORDERED, ADJUDGED, and DECREED that:

1. McCormick is enjoined from representing that cellular glass product or insulation supplied by it is comprised of Foamglas® cellular glass insulation or any other Pittsburgh Corning product, in whole or in part, unless the product supplied by McCormick is in fact comprised of Foamglas® cellular glass insulation or another Pittsburgh Corning product.

2. In the event the McCormick product is partially comprised of Pittsburgh Corning product, the exact specifications detailing the composition of the product and the source of the components shall be provided to the customer.

3. For the twenty-four (24) months following the date of this order, if McCormick sells a cellular glass product other than a PCC product, McCormick shall provide a disclaimer to all customers ordering

cellular glass insulation that the product being provided by McCormick is <u>not</u> PCC Foamglas® cellular glass insulation.

4.  McCormick shall send on company letterhead by registered mail return receipt requested the body of the notice attached to this Order as Exhibit A to the customers who comprise the list of fifty-three who may have received cellular glass insulation from the Chinese sources. It shall send said notice within three (3) days of its receiving this Order and shall notify the Court once all the notices have been sent.  It also shall provide the Court with copies of the return receipts from all fifty-three customers.

5.  This Court's Protective Order of May 7, 2010 notwithstanding, McCormick shall send on company letterhead the body of the notice attached to this Order as Exhibit B to the person or office at the Occupational Safety and Health Administration authorized to receive said notice.  As enclosures, it shall send a copy of this Order, copies of Mr. Nelson's Report (Nelson Aff., Exs. B & C) and Mr. Rickabaugh's Report (Pl.'s Master Ex., Ex. 35); and the Material Safety Data Sheet sent to its customers on September 28, 2010. (Defs.' Hr'g Ex. Inj-2.)  It shall send said notice and enclosures within five (5) days of its receiving this Order and shall notify the Court once the information has been sent and to whom the information was sent.

Plaintiff's Motion for Preliminary Injunction is GRANTED to the extent specified above.

IT IS SO ORDERED, this 13th day of October, 2010.

**EXHIBIT A:**

**NOTICE TO 53 MCCORMICK CUSTOMERS WHO MAY HAVE RECEIVED CHINESE-SOURCED CELLULAR GLASS INSULATION**


An Order from the North Carolina Business Court requires that McCormick Insulation Supply, Inc. send you this notice.

McCormick Insulation Supply, Inc. was an authorized distributor of Pittsburgh Corning Foamglas® cellular glass insulation from 1963 until May 2008.

From 2008 until September 2010, McCormick Insulation Supply, Inc. received cellular glass insulation from Qingdao International Tradelink Co.; Mowco Insulation & Sealing Products; and Jiaxing Lianxin Foamglass Co., three companies located in China. Our supplier of fabricated cellular glass insulation, Batt Fabricators, Inc., comingled Pittsburgh Corning Foamglas® cellular glass insulation and material from these Chinese vendors. McCormick Insulation Supply, Inc. believes you may have received insulation from the Chinese sources.

Expert studies recently conducted have shown that the Chinese material has higher conductivity than the Pittsburgh Corning Foamglas® cellular glass insulation. Thus, it is an inferior insulator to the Pittsburgh Corning Foamglas® cellular glass insulation. Foamglas® cellular glass insulation meets the requirements for Cellular Glass Thermal Insulation as defined in ASTM International C552-07. Cellular glass insulation from these Chinese vendors does not meet this standard.

**Additionally, these studies have shown that the Chinese material contains crystalline silica in sizes and amounts that could be inhaled. Crystalline silica is recognized as a human carcinogen. It is regulated by the Occupational Safety and Health Administration ("OSHA") under 29 CFR § 1910.**

The letter sent to you by Brett McCormick dated September 28, 2010 and the Material Safety Data Sheet enclosed with it apply only to the cellular glass material that came from Chinese sources, which you may or may not have received. It does not apply to Pittsburgh Corning Foamglas® cellular glass insulation.

**EXHIBIT B:**
**NOTICE TO THE OCCUPATIONAL SAFETY & HEALTH ADMINISTRATION**


Pursuant to an Order from the North Carolina Business Court, McCormick Insulation Supply, Inc. sends you this notice and enclosures.

From 2008 until September 2010, McCormick Insulation Supply, Inc. imported eleven (11) shipping containers filled with cellular glass insulation from three Chinese companies: Qingdao International Tradelink Co.; Mowco Insulation & Sealing Products; and Jiaxing Lianxin Foamglass Co. This material is for use in the construction industry. During litigation, the material was subjected to laboratory analysis. Analysis revealed that this material contains crystalline silica at concentrations that are in excess of 0.1 wt. percent. Tests showed that the crystalline silica concentrations ranged from 1.3% to 2.7%. Quartz grains were observed in the material that are in the respirable size range.

The total supply of cellular glass insulation received from the Chinese sources was approximately 100,000 kg (220,000 pounds). Though McCormick Insulation Supply, Inc. cannot be certain about which customers received the material, it is aware of fifty-three customers who may have received the material. It has sent those customers the enclosed MSDS.

Enclosed are reports from two experts who have conducted laboratory analysis of the material and a Material Safety Data Sheet for the Chinese material that McCormick Insulation Supply, Inc. sent to the fifty-three customers who may have received this material.

McCormick Insulation Supply, Inc. still has in its possession Chinese cellular glass insulation from at least one shipping container.